UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **BENJAMIN CARTER** | : | CIVIL ACTION NO. 11-0422 |
| | | SEC. P. |
| VS. | : | JUDGE DONALD E. WALTER |
| **BILLY TIGNER, ET AL.** | : | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion for summary judgment [doc. # 18] filed by defendants Billy Tigner and Courtney Whitehead. For reasons assigned below, it is recommended that the motion be **GRANTED**.

### Procedural History

On March 14, 2011, Benjamin Carter, an inmate in the custody of Louisiana's Department of Public Safety and Corrections, filed the instant pro se civil rights complaint pursuant to 42 U.S.C. § 1983 against Jackson Parish Correctional Center ("JPCC") Warden Billy Tigner and Nurse Courtney Whitehead. Carter contends that he did not receive constitutionally adequate medical care for his right shoulder injury while confined at the JPCC, and that the named defendants were deliberately indifferent to this serious medical need. Specifically, plaintiff contends that defendants failed to provide him with his prescribed dosage of Motrin (a brand name for the drug ibuprofen) or physical therapy, consisting of hot compresses and stretching exercises. In his original complaint, he sought a court order requiring defendants to provide him with his prescribed treatment, plus unspecified monetary damages for the pain and suffering that he endured. However, because Carter no longer is housed at the JPCC, his

requested remedy is limited now to compensatory damages for pain and suffering. *See* Carter Depo., pg. 80; MSJ, Exh. C.[1]

On August 12, 2011, the court determined that plaintiff sufficiently pleaded a cause of action, and ordered service on defendants. (Aug. 12, 2011, Mem. Order [doc. # 6]). On October 4, 2011, defendants filed their answer to plaintiff's complaint, as amended. [doc. # 9]. Following a period for discovery, defendants filed the instant motion for summary judgment on February 3, 2012. The briefing deadline has since lapsed, but plaintiff failed to respond to the motion.[2] Accordingly, the motion is deemed unopposed. (Notice of Motion Setting [doc. # 19]). The matter is now before the court.

## Summary Judgment Principles

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2511 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id*.

"[A] party seeking summary judgment always bears the initial responsibility of informing

---

[1] As plaintiff "has long since been transferred away from the [JPCC] and there is no indication that he will return to that facility, his claims for declaratory and injunctive relief are moot." *Busick v. Neal*, 380 Fed. Appx. 392, 398-399, 2010 WL 2102322, *6 (5th Cir. May 26, 2010) (unpubl.) (citation omitted).

[2] On February 13, 2012, plaintiff filed a motion for appointment of counsel, which the court denied. [doc. #s 20-21].

the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id*.

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. "The court *need* consider only the cited materials, but it *may* consider other materials in the record." Fed.R.Civ.P. 56(c)(3) (emphasis added). While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). There can be no genuine issue as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23. This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

When a movant bears the burden of proof on an issue, it must establish "beyond

3

peradventure[3] all of the essential elements of the claim . . . to warrant judgment in [its] favor."
*Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). In other words, the movant must affirmatively establish its right to prevail as a matter of law. *Universal Sav. Ass'n v. McConnell*, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

<u>Analysis</u>

I.  **Inadequate Medical Care**

    a)    <u>Law</u>

As a convicted inmate, plaintiff's claim for inadequate medical care is analyzed under the Eighth Amendment's prohibition against cruel and unusual punishment. To establish liability, an inmate must adduce facts which "clearly evince" a serious medical need and the prison official's deliberate indifference to it. *Hernandez v. Velasquez*, 522 F.3d 556, 561 (5th Cir. 2008) (citation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976).

Deliberate indifference in the context of an episodic failure to provide reasonable medical care to a prisoner means that: (1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the official actually drew that inference; and (3) the official's response indicates that the official subjectively intended that harm occur. *Thompson v. Upshur County, Tx.*, 245 F.3d 447, 458-59 (5th Cir. 2001). "[T]he failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*,

---

    [3] I.e., beyond doubt.

245 F.3d at 459. "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *see also Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999). "[A] delay in medical care violates the Eighth Amendment only if it is due to deliberate indifference and results in substantial harm." *Gregory v. McKennon*, 2011 WL 2473714 (5th Cir. June 22, 2011) (unpubl.) (citation and internal quotation marks omitted).

    b)    <u>Evidence</u>

In support of their motion for summary judgment, defendants submitted their respective affidavits; a copy of plaintiff's JPCC medical file; plaintiff's November 4, 2011, deposition taken in connection with this matter; a copy of the JPCC Inmate Handbook; and medical records from E.A. Conway Hospital. *See* MSJ, Exhs. A-D.

The evidence establishes that upon his July 1, 2010, initial arrival at the JPCC, Carter advised the intake nurse that he recently had sustained a right shoulder injury. (Carter Depo., pgs. 15, 18; MSJ Exh. C). He also completed an inmate request form indicating that he suffered right arm pain that made it difficult to sleep at night. (Carter Depo., pgs. 26-27; Whitehead Aff., Exh. A1, pg. 035). On July 6, 2010, Carter was seen by a nurse, who prescribed Naproxen and penicillin. (Carter Depo., pgs. 19-20, 27; Whitehead Aff., Exh. A1, pg. 035). Carter received the medication, which he felt was appropriate treatment for his condition. (Carter Depo., pg. 28-29).

Sometime that July, Carter was transferred from Unit I to Unit II within the JPCC, but his medication protocol did not transfer with him. (Carter Depo., pgs. 38-41). Accordingly, Carter wrote a request to Nurse Whitehead about his right shoulder injury, but received no response. *Id*. Carter thinks that someone, but, he is not sure who, "dropped the ball" with regard to his

medication not accompanying his transfer from Unit I to Unit II. *Id*. Moreover, Carter was not aware whether the prescription was intended to last but for a certain period, with the expiration date happening to coincide with his transfer. *Id*., pgs. 41-43. Carter made another medical request in August, but, again, received no response. *Id*., pgs. 43-44.

During the first week of October 2010, Carter was seen by a nurse for his right shoulder pain. (Carter Depo., pgs. Nurse's Notes; Whitehead Aff., Exh. A1, pg. 021. The nurse's notes reflect that Carter complained of clicking and throbbing in his right shoulder, which impaired his ability to sleep on that shoulder. *Id*. The nurse also noted some crepitus upon movement of the shoulder, and referred Carter to the orthopedic clinic at E.A. Conway Hospital. *Id*.

On December 9, 2010, Carter was seen at the E.A. Conway Orthopedic Clinic where he was diagnosed with possible sub-acromial bursitis or possible AC strain. (Whitehead Aff., Exh. A1, pg. 030). He received a shot of Lidocaine and Kenalog, and was directed to exercise with hand weights. *Id*. However, the shot only slightly decreased his pain. (Carter Depo., pg. 52).

On January 13, 2011, Carter returned to E.A. Conway, and had x-rays taken of his shoulder. (Whitehead Aff., Exh. A1, pgs. 027-028). He still complained of pain, decreased range of motion, and loss of feeling in his right shoulder and arm. (Carter Depo., pg. 53). The orthopedist noted that the x-rays suggested a possible Grade II AC joint separation. (Whitehead Aff., Exh. A1, pgs. 027-028). *Id*. The orthopedist issued a prescription for 800 mg of Motrin, twice per day. *Id*.

Carter maintains that after he returned to JPCC from his January orthopedic appointment, he never received his prescription for Motrin. (Carter Depo., pgs. 56-57). Therefore, after several days, he wrote a medical request to Nurse Whitehead inquiring about his prescription. *Id*.

However, he never received a response. *Id*. Following another request concerning another injury, he learned that "they" had substituted ibuprofen to fill the prescription. *Id*. Carter nonetheless maintains that he "never" received medication after January 13, 2011. *Id*. After prompting by counsel, however, plaintiff acknowledged that from July 17 until his transfer out of the JPCC on August 25, 2011, he received 600 mg of ibuprofen in connection with a hernia injury. *Id*., pgs. 88-89, 59.

Carter's JPCC medical records indicate that from February 2, 2011, until February 13, 2011, he was offered 800 mg of Ibuprofen, but refused it. (Whitehead Aff., Exh. A1, pg. 023). Conversely, Carter testified that he never refused any medication that was presented to him. (Carter Depo., pg. 40). On February 14, 2011, Nurse Whitehead noted that Carter's ibuprofen treatment was discontinued, pursuant to Dr. Hearn's verbal treatment order, because of Carter's non-compliance. *Id*., pg. 021.[4] Exactly two months later, without explanation, Dr. Hearn reinstated the order for ibuprofen. *Id*.[5] Carter's file, however, does not contain any medication records indicating that he was offered ibuprofen in May 2011. *Compare* Whitehead Aff., Exh. A1, pgs. 023-026.

Carter returned to the orthopedic clinic for follow-up on May 12, 2011. (E.A. Conway Records; MSJ Exh. D, pg. 07). He complained of the "same old thing," and described his pain as a seven on a ten point scale. *Id*. However, a May 16, 2011, MRI of the right shoulder proved

---

[4] Dr. Hearn is the JPCC physician.

[5] Carter's medical file does not include any associated treatment notes by Dr. Hearn.

unremarkable. *Id.*, pg. 08.[6] Carter was scheduled to return to the orthopedic clinic on May 26, 2011, but there is no indication that he ever did – possibly because of the benign MRI result. *Id.*, pg. 7.[7] Importantly, the record from the May 12, 2011, orthopedic visit, does not include a renewal of plaintiff's prior prescription for Motrin, or any other order for treatment. (E.A. Conway Records; MSJ Exh. D, pg. 07).

Warden Tigner averred that it was JPCC policy not to administer physical therapy. (Warden Aff. MSJ Exh. B). Rather, physical therapy, if ordered, was administered through the state hospital system. *Id*. However, Nurse Whitehead was unable to find any orders for physical therapy in Carter's medical records. (Whitehead Aff., MSJ Exh. A).

Carter testified that the instant complaint stems from the JPCC discontinuing his medication for his right shoulder injury, and because the facility did not provide him with physical therapy. (Carter Depo., pgs. 76-77). Carter did not know whether the pain medication and physical therapy that he did not receive at JPCC had any effect on the decreased range of motion that he continues to experience with his shoulder. *Id.*, pg. 79. Moreover, his shoulder was the same on November 4, 2011, as it was the first time he went to E.A. Conway Hospital. *Id.*, pg. 20.

---

[6] Specifically, "[t]he muscle bellies and tendons of the rotator cuff [were] normal in position and signal. The bones [were] normal in signal. No abnormal fluid accumulation [was] seen. The labrum appear[ed] normal." *Id*.

[7] Carter was seen at the E. A. Conway Surgery Clinic on May 20, 2011, to receive treatment for a right inguinal hernia. (E.A. Conway Records; MSJ Exh. D, pg. 09). He was scheduled to return to Conway on July 1, 2011, for "pre-op,", but there is no evidence that he did. *Id*.

      c)      <u>Discussion</u>

With regard to plaintiff's complaint that defendants failed to provide him physical therapy, the court observes that there is nothing in plaintiff's treatment records from E.A. Conway indicating that the orthopedist ordered physical therapy. *See* MSJ Exh. D. In this court's experience, when a physician prescribes physical therapy she will issue an accompanying written treatment note or order. Here, none exist. Moreover, according to plaintiff, his missing physical therapy consisted of hot compresses and some unspecified shoulder manipulation or stretching. (Carter Depo., pgs. 64-69). Although plaintiff admitted that he had access to a towel and hot water at the JPCC, he believed that the JPCC's water was not hot enough for a compress. *Id*. However, there is no indication that plaintiff could not have availed himself of a warm compress to at least afford himself some relief. *Id*. In addition, there is no indication that plaintiff could not have manipulated or stretched his own shoulder. While plaintiff professed ignorance of such techniques, there is no evidence that Whitehead or Tigner, who are licenced practical nurses, were so trained.

Whitehead and Tigner both profess that, during the period at issue, they were not aware that plaintiff sought any additional medication or treatment than what he received. In contrast, plaintiff maintains that he advised Whitehead and Tigner (after his visit to E.A. Conway Hospital), that he was not receiving his prescription for Motrin. Of course, at this stage of the proceedings, the court is compelled to resolve this disputed issue of fact in favor of plaintiff. Nonetheless, even if defendants knew that plaintiff had not received his ibuprofen for a period that lasted up to six months (August-October 2010 and January-May 2011), the court is not persuaded that their inaction demonstrates their deliberate indifference to a serious medical need.

First, the Fifth Circuit has held that a prisoner's failure to receive his prescription for 800 mg of ibuprofen does not suffice to establish his custodian's intentional indifference to a serious medical need. *Garcia v. Assistant Warden Sanders*, 21 F.3d 1109 (5th Cir. Apr. 28, 1994) (unpubl.). Second, if ibuprofen was as vital to plaintiff's treatment as he contends, then it stands to reason that E.A. Conway would have reissued the prescription during plaintiff's May 12, 2011, appointment. However, it did not do so.

Furthermore, when counsel asked plaintiff whether he had ever bought over-the-counter medications at the prison commissary, plaintiff replied that he had not, because he lacked the funds to make the purchase – not because comparable over-the-counter medicine was unavailable. (Carter Depo., pgs. 80-81). After additional prompting by counsel, plaintiff later conceded that he enjoyed sufficient funds to buy cigarettes at the commissary. *Id*. In fact, according to plaintiff's financial history attached to his motion for leave to proceed in forma pauperis filed in this matter, he received deposits totaling $130 in his prison account between August 2010 and January 2011. *See* doc. # 2. In other words, if the lack of ibuprofen was so serious that it warranted the instant § 1983 complaint, it stands to reason that plaintiff would have attempted to alleviate his discomfort by purchasing an over-the-counter version of the pain reliever at the prison commissary, while he awaited the outcome of this action.

The court does not question that *according to the facts alleged by plaintiff*, defendants do not appear to have been overly concerned with his right shoulder injury. On the existing record, however, it is manifest that Nurse Whitehead and Warden Tigner's inattention did not rise to the level of deliberate indifference to a serious medical need. The court observes that JPCC personnel took Carter to an orthopedist for evaluation. He received diagnostic testing at the

hospital, including x-rays and an MRI, that ultimately suggested a benign condition. He also received an injection in his shoulder that provided little relief. There is no indication that ibuprofen would have been any more effective than the shot. JPCC also took him to at least two follow-up visits with the orthopedist.

Continuous medical care ordinarily precludes a finding of deliberate indifference on the part of prison officials. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Mayweather v. Foti,* 958 F.2d. 91 (5th Cir. 1992). Further, even if Whitehead and Tigner were less than fully engaged with Carter's right shoulder injury, he has not adduced any evidence to establish that their actions or inaction materially exacerbated his condition or caused him lasting harm. *See Gregory, supra* (no deliberate difference where pharmacy staff responded to inmate's medical needs in some way, and no proof of resulting harm from their actions); *Harris v. Walley*, 2011 WL 3501824 (5th Cir. Aug. 10, 2011) (unpubl.) (no deliberate indifference for one year delay in dental surgery where defendants made efforts to treat and monitor dental problems and no proof of permanent resulting injury); *Barrett v. Mississippi Dept. of Corrections*, 2011 WL 2183431 (5th Cir. June 3, 2011) (unpubl.) (inmate's argument that medical staff did not use the most efficacious method of treatment, e.g., performing surgery earlier, does not establish a claim of deliberate indifference) (citation omitted).

In response to defendants' motion, plaintiff has not adduced any evidence that a defendant herein actually inferred a substantial risk of harm stemming from plaintiff's alleged inadequate medical treatment, or that a defendant subjectively intended him to suffer harm. Rather, the evidence confirms that defendants provided plaintiff with constitutionally required medical care. The fact that plaintiff does not believe that his medical treatment was as swift or

11

comprehensive as it could have been is not a cognizable complaint under the Civil Rights Act. Prisoners are not entitled to the "best medical care money can buy." *See Mayweather, supra*; *Woodall v. Foti*, 648 F.2d 268 (5th Cir. 1981).

## II. Government Entity and Supervisory Liability

To the extent that plaintiff intended to sue defendants in their official capacities, the court observes that official-capacity suits, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985) (citing, *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55 (1978)). To impose § 1983 liability against a government entity for the misconduct of one of its employees or officers, plaintiff must demonstrate that the constitutional deprivation was caused by a policy or custom of the entity. *Kohler v. Englade*, 470 F.3d 1104, 1115 (5th Cir. 2006) (citing *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 2036 (1978)). "In a Section 1983 case, the burden of proving the existence of an unconstitutional municipal policy or established custom rests upon the plaintiff." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989).

In the case *sub judice*, plaintiff has not established an underlying constitutional violation by Whitehead or Tigner in their individual capacities. *A fortiori*, he has not identified a precipitating unconstitutional custom or policy enacted by the government entity. *See Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (because the officers did not violate plaintiff's constitutional rights, neither did the city).

Insofar as plaintiff seeks to hold Tigner liable in his supervisory capacity, the court

12

observes that supervisors can be held liable when the "enforcement of a policy or practice results in a deprivation of federally protected rights." *Bustos, supra* (citation omitted). Again, however, because plaintiff has failed to allege or establish a constitutional violation by the individuals directly involved in the challenged activity, he cannot show that any supervisor implemented a policy or custom that violated his constitutional rights. *Bustos*, 599 F.3d at 468.

### III.  Qualified Immunity

Defendants also invoke the affirmative defense of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (quoted sources omitted). When a defendant invokes qualified immunity, the burden shifts to plaintiff to establish that the defense is inapplicable. *Id.* (citation omitted). Plaintiff's burden is two-pronged. *Id.* First, he must demonstrate that defendants violated a constitutional right under current law. *Id.* "Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Id.* (quoted source and internal quotation marks omitted). The courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (*citing Pearson v. Callahan*, 808 U.S. 2009, 129 S.Ct. 808 (2009)).

In the case *sub judice*, plaintiff has not shown that defendants violated his constitutional

rights. Accordingly, further analysis of the qualified immunity defense is unnecessary.[8]

## IV.    State Law Claims

To the extent that plaintiff's complaint, as amended, sets forth additional claims arising under state law (e.g., a tort claim for negligence), when, as recommended here, all constitutional claims which conferred federal subject matter jurisdiction are dismissed, the court may decline to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367.[9] In fact, this is the general rule. *Priester v. Lowndes County*, 354 F.3d 414, 425 (5th Cir. 2004) (citation omitted). The twin interests of comity and efficiency dictate that any remaining state law claims be dismissed without prejudice. 28 U.S.C. § 1367(c).[10]

### Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion for summary judgment [doc. # 18] filed by defendants Billy Tigner and Courtney Whitehead be **GRANTED**, and that judgment be entered in favor of said defendants, dismissing with prejudice plaintiff's claims arising under the Constitution and laws of the United States. Fed. R. Civ. P. 56.

**IT IS FURTHER RECOMMENDED** that any remaining state law claims be DISMISSED, without prejudice. 28 U.S.C. § 1367(c).

---

[8] The qualified immunity defense only applies "as a protective shield once a plaintiff has made out a claim against an official acting in his individual capacity." *Goodman v. Harris County*, 571 F.3d 388, 396 (5th Cir. 2009).

[9] In the case *sub judice*, there is no indication that the court may exercise diversity jurisdiction, 28 U.S.C. § 1332.

[10] The limitations period is tolled for a minimum of 30 days after dismissal. *See* 28 U.S.C. § 1367(d).

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 12th day of April 2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE